**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BLUEFIELD DIVISION**

**TONYA RIFFE,**

     **Plaintiff,**

**v.**                                                        **Case No.: 1:20-cv-00448**

**ANDREW M. SAUL,
Commissioner of the
Social Security Administration,**

     **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable David A. Faber, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Motion for Judgment on the Pleadings and Memorandum in Support and the Commissioner's Brief in Support of Defendant's Decision, requesting judgment in his favor. (ECF Nos. 14, 15, 16).

For the following reasons, the undersigned **RECOMMENDS** that the Court **GRANT** Plaintiff's motion for judgment on the pleadings to the extent that it requests

remand of the Commissioner's decision pursuant to sentence four of 42 U.S.C. § 405(g); **DENY** Defendant's request to affirm the decision of the Commissioner; **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this PF&R; and **DISMISS** this case, **with prejudice**, and remove it from the docket of the Court.

## I.    Procedural History

In December 2016, Plaintiff Tonya Riffe ("Claimant") protectively filed applications for DIB and SSI, alleging a disability onset date of March 1, 2015 due to "major depression, anxiety, panic attacks, agoraphobia, spina bifida, degenerative back disease, protruding discs, [plantar fasciitis], hammer toe, foot neuroma, morbid obesity, anemia, hiatal hernia, esophagitis, hearing loss in left ear, high cholesterol, and high blood pressure." (Tr. at 15, 246). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 15). Thus, Claimant requested an administrative hearing on her applications for benefits, which was held on April 10, 2019 before the Honorable Michael Dennard, Administrative Law Judge (the "ALJ"). (Tr. at 35-69). By written decision dated May 21, 2019, the ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 12-34). The ALJ's decision became the final decision of the Commissioner on May 4, 2020 when the Appeals Council denied Claimant's request for review. (Tr. 1-6).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 10, 11). Claimant filed a Motion for Judgment on the Pleadings and Memorandum in Support, and the Commissioner filed a Brief in Support of Defendant's Decision. (ECF Nos. 14, 15,

16). Consequently, the matter is fully briefed and ready for resolution.

## II.    **Claimant's Background**

Claimant was 38 years old on her alleged onset date and 42 years old on the date of the ALJ's decision. (Tr. at 27). She has the equivalent of a high school education, communicates in English, and previously worked in a composite position of desk clerk, maid, and building maintenance worker in a hotel. (Tr. at 63, 245, 247).

## III.    **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary, and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

3

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c).

4

Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the four functional areas of understanding, remembering, or applying information; (2) interacting with others; (3) maintaining concentration, persistence, or pace; and (4) adapting or managing oneself will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2020. (Tr. at 18, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since March 1, 2015, the alleged disability onset

date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant's severe impairments included: degenerative disc disease, obesity, essential hypertension, hyperlipidemia, depression, and anxiety. (*Id.*, Finding No. 3). The ALJ also considered Claimant's ankle pain and sprain, plantar fasciitis, mild distal esophagitis, ulcer, small hiatal hernia, mild gastritis, and migraines, but he found that the impairments were non-severe. (Tr. at 18). The ALJ further concluded that "all other impairments aside from those enumerated above" were non-severe or not medically determinable impairments. (Tr. at 18-19). Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 19-21, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant can occasionally lift and carry ten pounds and frequently lift and carry ten pounds, sit for six hours in an eight-hour workday, and stand and walk for two hours in an eight-hour workday. She can frequently reach overhead to the left and right, and frequently reach left and right for all other reaching. She can frequently climb ramps and stairs, balance, kneel, and crouch, occasionally stoop and crawl, and never climb ladders, ropes, or scaffolds. She is able to perform simple routine tasks and make simple work related decisions, can occasionally interact[] with supervisors, coworkers, and the public, and deal with occasional changes in the routine work setting.

(Tr. at 21-27, Finding No. 5).

At the fourth step, the ALJ determined that Claimant could not perform her past relevant work. (Tr. at 27, Finding No. 6). Therefore, the ALJ reviewed Claimant's past work experience, age, and education in combination with her RFC to determine her ability to engage in other substantial gainful activity. (Tr. at 27-29, Findings 7 through 10). The ALJ considered that (1) Claimant was born in 1976 and was defined as a younger individual age 18-44 on her alleged disability onset date; (2) Claimant had at least a high

6

school education and could communicate in English; and (3) transferability of job skills was not an issue because the Medical-Vocational Rules supported a finding that Claimant was "not disabled," regardless of her transferable job skills. (Tr. at 27-28, Findings 7 through 9). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform other jobs that existed in significant numbers in the national economy, including work as an inspector, bonder, or sealer. (Tr. at 28-29, Finding No. 10). Consequently, the ALJ concluded that Claimant was not disabled as defined by the Social Security Act and was not entitled to benefits. (Tr. at 29, Finding No. 11).

## IV.    **Claimant's Challenges to the Commissioner's Decision**

Claimant presents two challenges to the Commissioner's decision. First, Claimant argues that the ALJ's subjective symptom analysis is flawed because the ALJ did not discuss the full range of factors that were implicated by the evidence, mischaracterized the evidence that he considered, dismissed Claimant's physical complaints based only on objective evidence, and provided unsupported reasons for discounting her mental symptoms. (ECF No. 15 at 5-17). In her second challenge, Claimant contends that the ALJ did not explain how he constructed her RFC. (*Id.* at 17). She asserts that the ALJ listed evidence that was contrary to the RFC, but he did not articulate how the evidence supported the functional limitations that he assessed. (*Id.* at 18). Furthermore, Claimant argues that the ALJ did not explain how her March 2019 lumbar CT scan was consistent with the RFC, or why it did not constitute a significant advancement from prior findings. (*Id.* at 17).

In response to Claimant's challenges, the Commissioner argues that the "substantial evidence" standard of review is highly deferential to the Commissioner's

decision, and, under that deferential standard, substantial evidence supports the ALJ's evaluation of Claimant's subjective symptoms and RFC determination. (ECF No. 16 at 13-20).

## V.    Relevant Evidence

The undersigned has reviewed all of the evidence before the Court. The following evidence is most relevant to the issues in dispute.

### A. Treatment Records

On March 3, 2016, Claimant presented to orthopedic physician, Robert P. Kropac, M.D., complaining of neck and low back pain. (Tr. at 529). She reported constant neck pain, which was aggravated by moving her head and neck. (*Id.*). Claimant stated that her back pain was also a constant symptom, and it increased with postural activities such as bending, stooping, walking, standing, and even lying in a prolonged position. (*Id.*). Claimant weighed 345 pounds. (Tr. at 530). Dr. Kropac examined Claimant, noting spinal and paraspinal tenderness, pain on extension of the cervical spine, trace deep tendon reflexes, slightly reduced flexion and extension of the lumbar spine, increased low back pain upon range of motion and motor strength testing of the hips, and a positive straight leg raising test at 90 degrees in the sitting position. (Tr. at 530-32). X-rays of Claimant's cervical and lumbosacral spine did not show any abnormalities other than spina bifida at L5-S1. (Tr. at 532). Dr. Kropac diagnosed Claimant with cervicodorsal and lumbosacral strains for which he prescribed Motrin and Neurontin. (*Id.*).

On April 7, 2016, Claimant told Dr. Kropac that her neck and back pain were still constant, but the pain was more tolerable with medications. (Tr. at 527). Dr. Kropac recorded essentially the same examination findings, except that Claimant's straight leg raising test was negative. (Tr. at 527-28). He prescribed Zantac to offset the acidic side

effects of Motrin, but otherwise made no changes to Claimant's diagnoses or medications. (Tr. at 528).

The following month, on May 3, 2016, psychiatrist, Philip B. Robertson, M.D., performed an initial psychiatric diagnostic evaluation of Claimant at Psychiatric Associates of the Virginias. (Tr. at 418). Claimant stated that she felt increasingly depressed and overwhelmed. (*Id*.). On examination, her mood was moderately to severely depressed; she was very tearful, constricted, and non-reactive; her concentration, judgment, and insight were fair; and she displayed mild irregular hand tremors. (Tr. at 419). Dr. Robertson diagnosed Claimant with moderately severe major depressive disorder and prescribed Wellbutrin, Ambien, and Ativan. (*Id*.). He also referred Claimant to a psychologist for individual counseling. (*Id*.). Claimant reported no improvement on May 24, 2016. Thus, Dr. Robertson changed her medications. (Tr. at 416-17).

Claimant followed up with Dr. Kropac on June 6, 2016. She advised him that she stopped taking Neurontin one week earlier due to headaches, and the headaches ceased after she discontinued the medication. (Tr. at 525). Claimant's neck and back pain was "about the same." (*Id*.). Dr. Kropac referred Claimant to a physical therapist in addition to prescribing medication. (Tr. at 526). Claimant saw Shanna Autrey, PA-C, at Psychiatric Associates of the Virginias the same month on June 14, 2016. She stated that she still felt the same with no improvement in her mental symptoms, and she exhibited depressed mood and flat affect on examination. (Tr. at 415). Thus, PA-C Autrey adjusted Claimant's psychiatric medications. (*Id*.). PA-C Autrey recorded during Claimant's subsequent visit on July 12, 2016 that Claimant could not tolerate her medication Seroquel because it caused her to be overly sedated. (Tr. at 414). PA-C Autrey prescribed Buspar, Lexapro, and Ambien. (*Id*.).

Claimant reported to Dr. Kropac on August 1, 2016 that her neck and back pain was more tolerable with medication, but there was no improvement, and she now experienced pain radiating into her extremities. (Tr. at 523). There was no significant change in Claimant's examination findings, including tenderness, pain upon range of motion testing, and trace reflexes. (Tr. at 523-24). Dr. Kropac again prescribed Motrin and physical therapy, and he ordered an MRI to rule out cervical and lumbar disc herniation with radiculitis. (Tr. at 524).

On August 9, 2016, Claimant reported increased anxiety to PA-C Autrey. She exhibited an anxious mood. (Tr. at 413). PA-C Autrey diagnosed Claimant with panic, anxiety, and depressive disorders. (*Id.*). She adjusted Claimant's dosage of Lexapro and Ambien, renewed Buspar, and prescribed a trial of Klonopin. (*Id.*).

Claimant's MRIs were taken on August 12, 2016. Her cervical MRI showed a disc bulge at C5-6 that was causing mild foraminal narrowing, but no other cervical abnormalities. (Tr. at 385). Claimant's lumbosacral MRI indicated a small disc protrusion at T11-12 that was mildly impinging on the thecal sac, a bulging annulus at L4-5 with small protrusion and facet arthropathy with mild spinal stenosis and moderate bilateral recess narrowing, and a small protrusion at L5-S1 that was mildly impinging on the thecal sac and a bulging annulus causing mild foraminal narrowing with facet arthropathy. (Tr. at 384, 386).

Claimant followed up with PA-C Autrey on October 6, 2016. She reported that she had been doing better, but her grandmother died that week, and she became more emotional. (Tr. at 412). She suffered a panic attack and had to leave her grandmother's funeral. (*Id.*). Claimant also said that Klonopin was no longer helping her pain. (*Id.*). PA-C Autrey added diagnoses of adjustment disorder and grief to Claimant's previously

diagnosed conditions. (*Id*.). She increased Claimant's prescriptions for Buspar and Klonopin, renewed Lexapro, discontinued Ambien, and prescribed a trial of Abilify. (*Id*.). On December 7, 2016, Claimant told PA-C Autrey that she was "doing okay" and tolerating her medications well, but she displayed a dysphoric mood. (Tr. at 410).

On February 2, 2017, Claimant was very anxious during her appointment with PA-C Autrey, and she expressed that she had a feeling of dread whenever she had to leave her house. (Tr. at 409). She stated that she slept a lot during the day and stayed up at night. (*Id*.). PA-C Autrey prescribed medications and counseling. (*Id*.). Claimant later told PA-C Autrey on May 2, 2017 that she was "surviving." (Tr. at 452). She said that she experienced a lot of anxiety/panic and was canceling doctor appointments and not leaving her house. (*Id*.). On examination, Claimant was anxious and fidgety, but her mental status was otherwise normal. (*Id*.). PA-C Autrey discontinued Claimant's prescription for Klonopin because it was making Claimant tired, and she prescribed a trial of Xanax. (*Id*.). PA-C Autrey also renewed Claimant's prescriptions for Buspar, Lexapro, and prazosin, and she instructed Claimant to continue counseling with psychologist Steve Ferris. (*Id*.).

Claimant expressed to Dr. Kropac on May 24, 2017 that there was no change in her neck and back pain. (Tr. at 514). She described that the pain was constant and radiating into her extremities with numbness and tingling in her upper extremities. (*Id*.). Claimant also reported that her back pain was exacerbated by postural activities, including prolonged sitting. (*Id*.). On examination, Claimant still demonstrated tenderness, pain with range of motion testing, and trace reflexes. (Tr. at 514-15). Dr. Kropac diagnosed Claimant with cervicodorsal musculoligamentous strain superimposed on degenerative disc disease and degenerative arthritis and lumbar discogenic back disease with lower extremity radicular component. (Tr. at 515). He renewed Claimant's prescription for

Neurontin. (*Id.*).

During her subsequent appointment with Dr. Kropac on August 14, 2017, Claimant reported increased pain in her lower back and lower extremities, particularly her right lower extremity. (Tr. at 516). Dr. Kropac prescribed physical therapy and Neurontin. (Tr. at 517). He noted that, if Claimant's radicular symptoms persisted, he would order an MRI of her lumbosacral spine to rule out progression of her disc protrusion. (*Id.*).

On September 18, 2017, Claimant presented to Carol Felts, FNP, at the Psychiatric Associates of the Virginias. Claimant stated that she was "doing ok," but she stayed "really tired" due to Neurontin and her psychiatric medications. (Tr. at 498). Her mood was anxious on examination. (*Id.*). Nurse Felts adjusted Claimant's medications. (*Id.*). Despite the changes, Claimant told Nurse Felts on November 13, 2017 that she felt like "depression and anxiety [were] taking over again." (Tr. at 497). She presented as depressed and anxious with labile affect and excessive speech. (Tr. at 497). Nurse Felts again made changes to Claimant's medications. (*Id.*).

Claimant followed up with PA-C Autrey on December 21, 2017. She reported that she did not like the way that Xanax made her feel. (Tr. at 496). She further expressed that her anxiety was "through the roof" and that she had mood swings, was irritable, cried all night, and avoided leaving her home. (*Id.*). She described her symptoms as an "emotional roller coaster." (Tr. at 496). On examination, Claimant was depressed and anxious with dysphoric affect. (*Id.*). PA-C Autrey made further changes to Claimant's medications. (*Id.*). Claimant was very upset during her next appointment with PA-C Autrey on January 31, 2018. (Tr. at 495). She explained that she was involved in a domestic violence incident ten days earlier, which culminated in her father shooting and killing her boyfriend. (*Id.*). Claimant's mood was anxious and depressed. (*Id.*). PA-C Autrey again changed

Claimant's medications. (*Id.*). During Claimant's next appointment with PA-C Autrey, Claimant said that her medications were effective and tolerable. (Tr. at 494). However, PA-C Autrey observed that Claimant's mood was sad and worried. (*Id.*).

On May 9, 2018, Claimant told Dr. Kropac that there was no improvement in her neck and back pain. (Tr. at 518). She said that, if anything, the pain was worse since she ran out of medication. (*Id.*). Claimant described that her overall pain was more tolerable with medication, but she stated that it was still constant and aggravated by moving her head or neck, using her upper extremities, sitting, or standing. (*Id.*). Dr. Kropac renewed Claimant's prescription for Neurontin. (Tr. at 519).

Claimant followed up with Dr. Robertson on July 31, 2018. She complained of severe anxiety that was not controlled by Klonopin. (Tr. at 492). Dr. Robertson recorded that Claimant was avoiding social interaction by staying up all night and sleeping in the morning. (*Id.*). Her mood was depressed. (*Id.*). Two months later, on September 21, 2018, Claimant reported an exacerbation of neck and back pain to Dr. Kropac. (Tr. at 520). She said that the neck pain was more tolerable than her back pain, which was radiating into her lower extremities, now particularly the right lower extremity. (*Id.*). Dr. Kropac reviewed Claimant's lumbosacral MRI. It showed mild degenerative changes at L4-5 and L5-S1 with no evidence of high grade neural foraminal or spinal canal encroachment. (*Id.*). At L4-5, there was mild disc degeneration and a small posterior disc bulge with mild spinal canal and right neural encroachment. (*Id.*). At L5-S1, there was a small annular tear with small central disc protrusion producing mild spinal canal encroachment with no neural foraminal encroachment. (*Id.*). Noting that there was no evidence of nerve root impingement, Dr. Kropac instructed Claimant that there was no recommended treatment at that time other than medication. (*Id.*). Claimant's physical examination findings were

mostly normal, but Claimant demonstrated tenderness, limited range of motion in her lumbosacral spine secondary to pain, and trace reflexes. (Tr. at 521). Dr. Kropac prescribed Neurontin and Robaxin. (*Id.*).

On September 24, 2018, Claimant told PA-C Autrey that her depression improved since her last appointment, but she continued to exhibit depressed mood on examination. (Tr. at 491). Claimant stated that she wanted her psychiatric medications to remain the same until she received results from various tests regarding physical issues. (*Id.*). During her subsequent visit with PA-C Autrey on November 1, 2018, Claimant reported increased anxiety and stated that she did not think that she could "take any more mentally." (Tr. at 490). PA-C Autrey increased Claimant's prescriptions for Buspar and Zoloft, renewed Klonopin and prazosin, and referred Claimant for continued counseling. (*Id.*).

Claimant followed up with Dr. Kropac on January 16, 2019. She reported increased pain and stated that, although Neurontin made her pain more tolerable, it was becoming less effective. (Tr. at 511). Dr. Kropac again prescribed medication and did not recommend any other treatment. (Tr. at 512). However, on March 24, 2019, CT scans were taken of Claimant's spine following a motor vehicle accident. There was no spinal stenosis or neural foraminal narrowing in Claimant's cervical spine. (Tr. at 535). There was likewise no evidence of neural foraminal stenosis in Claimant's lumbar spine, but Claimant had central disc herniation at L4-5 with moderate to severe central canal stenosis that was new since her prior study in July 2018. (Tr. at 537).

### B. Evaluations, Opinions, and Prior Administrative Findings

On March 22, 2017, state agency physician Fulvio Franyutti, M.D., assessed Claimant's RFC based upon his review of her records. He concluded that Claimant could perform work at the light exertional level with frequent climbing of ramps/stairs,

balancing, stooping, kneeling, and crouching and occasional climbing of ladders/ropes/scaffolds and crawling. (Tr. at 77-78). Shortly thereafter, on March 28, 2017, state agency psychologist John Todd, Ph.D., performed a psychiatric review technique based upon his review of Claimant's records. He assessed that Claimant had mild functional limitations. (Tr. at 75). State agency psychiatrist James Binder, M.D., affirmed Dr. Todd's conclusions on August 1, 2017, except Dr. Binder assessed that Claimant had moderate limitation interacting with others. (Tr. at 103). Dr. Binder found that Claimant could perform basic work-like tasks in a setting with limited and routine social interactions. (Tr. at 107).

On October 5, 2017, Stephen Nutter, M.D., performed an internal medicine examination of Claimant. Claimant weighed 334 pounds. (Tr. at 473). She appeared stable at station, but she appeared uncomfortable attempting the supine position. (*Id*.). Claimant did not lie on her back and kept her legs bent. (*Id*.). She had reduced flexion and abduction in both shoulders, along with tenderness and pain on range of motion testing in her left shoulder. (Tr. at 474). Claimant further exhibited pain with range of motion testing in her right knee, cervical spine, and dorsolumbar spine, as well as tenderness in her left knee and dorsolumbar spine. (Tr. at 474-75). She could stand on her left leg for five seconds with good balance, but she could not stand on her right leg for any period of time. (*Id*.). Claimant could perform tandem gait but could only slightly bend her knees to squat due to complaints of back pain shooting down her right leg. (*Id*.).

Claimant's psychologist, Steve Ferris, MA, from Pathways Psychological Center wrote a letter to the Disability Determination Service on October 16, 2017. (Tr. at 481). He stated that Claimant clearly exhibited severe symptoms of panic disorder with agoraphobia and severe major depression. (*Id*.). He noted that Claimant avoided going

most places and frequently missed medical treatment and school meetings for her daughter due to agoraphobia. (*Id.*). Mr. Ferris stated that he personally witnessed Claimant have several panic attacks in his office, including a severe panic attack. (*Id.*). Claimant also cried most of the time in her sessions with Mr. Ferris and reported that she frequently cried at home and felt hopeless and helpless. (*Id.*). Mr. Ferris stated that he believed that Claimant was unable to sustain full time employment at that time. (*Id.*).

On October 20, 2017, state agency physician Pedro F. Lo, M.D., assessed Claimant's RFC based upon his review of her updated records. He agreed that Claimant could perform work at the light exertional level with frequent climbing of ramps/stairs, kneeling, and crouching and occasional crawling. (Tr. at 104-05). However, he concluded that Claimant could never climb ladders/ropes/scaffolds and only occasionally stoop. (Tr. at 105). He cited the results of Claimant's consultative examination in support of the assessed postural limitations. (*Id.*). Dr. Lo additionally found that Claimant had manipulative limitations, including frequent reaching in front, laterally, and overhead due to her limited range of motion and pain in her shoulders. (Tr. at 106).

### C. *Claimant's Statements*

Claimant testified during her administrative hearing on April 10, 2019 that she had constant back pain that radiated into her right leg, and she had to be very careful of how she moved, what she picked up, and how she lay or sat. (Tr. at 47). She said that she took medications, changed positions, used a massage pad, and applied numbing creams to treat her back pain. (Tr. at 48). Claimant testified that she had to lie down for 30 minutes to one hour approximately three or four times per day due to back, neck, and shoulder pain. (Tr. at 48, 50). Claimant testified that she also had to lie down due to migraines, which she suffered four to five times per week. (Tr. at 50-51). She explained that she

darkened her bedroom, put on sunglasses and a cold washcloth on her head, and took over-the-counter medication to treat her migraines. (Tr. at 51). In terms of mental impairments, Claimant testified that she had depression and anxiety that led to four or five panic attacks per week, which each lasted for 30 minutes to one hour. (Tr. at 52-53). She reportedly cried all of the time; felt a sense of dread and hopelessness; was always unhappy; and avoided being around people, including staying home and missing her daughter's after school programs and doctor appointments. (Tr. at 52, 55). Claimant stated that she asked family members to shop for her. (Tr. at 56). She testified that, if she had to go out, she shopped very quickly at a smaller store that she knew would not be crowded or she shopped in the middle of the night at 2:00 a.m. or 3:00 a.m. (Tr. at 56). Claimant asserted that she never ate in restaurants. (*Id*.).

## VI.    **Scope of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d

585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to ensuring that the ALJ followed applicable Regulations and Rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.   Discussion

Claimant challenges the ALJ's analysis of her subjective symptoms and RFC. Each argument is discussed below, in turn.

### A. Subjective Symptom Analysis

Claimant contends that the ALJ did not consider "other factors" that were implicated by the evidence to evaluate her symptoms, and that he mischaracterized the evidence and provided unsound reasons for the ALJ's findings regarding her symptoms.

Under the applicable Social Security rulings and regulations, an ALJ is obliged to use a two-step process when evaluating the credibility of a claimant's subjective statements regarding the effects of his or her symptoms. 20 C.F.R. §§ 404.1529, 416.929 (effective March 27, 2017). First, the ALJ must consider whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. *Id.* §§ 404.1529(a), 416.929(a). In other words, "an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability." Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029, at *2 (effective March 16, 2016). Instead, evidence of objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" must be present in the record and must demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological,

or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. §§ 404.1529(b), 416.929(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id*. §§ 404.1529(a), 416.929(a). If the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must consider "other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms," including a claimant's own statements. SSR 16-3p, 2016 WL 1119029, at *5-*6. In evaluating a claimant's statements regarding his or her symptoms, the ALJ must consider "all of the relevant evidence," including: the claimant's history; objective medical findings obtained from medically acceptable clinical and laboratory diagnostic techniques; statements from the claimant, treating sources, and non-treating sources; and any other evidence relevant to the claimant's symptoms, such as, evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and other factors relating to functional limitations and restrictions due to the claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(1)-(3), 416.929(c)(1)-(3); *see also Craig*, 76 F.3d at 595; SSR 16-3p, 2016 WL 1119029, at *4-*7.

SSR 16-3p provides further instruction on what type of evidence should be considered when the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence. SSR 16-3p, 2016 WL 1119029, at *6. The ruling presents an extensive list of evidence that may prove probative and notes that valuable

evidence to consider may include (1) a longitudinal record of any treatment and its success or failure, including any side effects of medication and (2) indications of other impairments, such as potential mental impairments, that could account for an individual's allegations. *Id.*

> In *Hines v. Barnhart*, the Fourth Circuit stated that:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. SSR 16-3p, 2016 WL 1119029, at *5.

Ultimately, "it is not sufficient for [an ALJ] to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.' It is also not enough for [an ALJ] simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the [ALJ] evaluated the individual's symptoms." *Id.* at *9. SSR 16-3p instructs that "[t]he focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person;" rather, the core of an ALJ's inquiry is "whether the evidence establishes a medically determinable impairment that could reasonably be

20

expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." *Id.* at *10.

When considering whether an ALJ's evaluation of a claimant's reported symptoms is supported by substantial evidence, the Court does not replace its own assessment for that of the ALJ; rather, the Court scrutinizes the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to the weight to be afforded to a claimant's report of symptoms, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

In this case, the ALJ considered Claimant's back, shoulder, and neck pain; migraines; depression; anxiety; and panic attacks. (Tr. at 22). After considering the evidence, the ALJ concluded that Claimant's medically determinable impairments could reasonably be expected to cause her alleged symptoms. (*Id.*). However, the ALJ found that Claimant's statements concerning the intensity, persistence, and limiting effects of the symptoms were "not entirely consistent with the medical evidence and other evidence in the record." (*Id.*). The ALJ cited Claimant's treatment records and consultative examination findings, concluding that the evidence did not dispute that Claimant had conditions, which singly or in combination, may cause her pain or difficulty. (Tr. at 24). However, the ALJ found that the evidence suggested that Claimant's symptoms may not exist at the level of severity that she alleged and "may have other mitigating factors against

their negative impact" on Claimant's ability to engage in work activity. (*Id.*).

First, the ALJ considered the type, dosage, and effectiveness of Claimant's treatment. The ALJ stated that, although Claimant received treatment for allegedly disabling impairments, her treatment was "essentially routine, conservative, and successful." (Tr. at 25). The ALJ remarked that Claimant's physicians recommended conservative treatment for her degenerative disc disease, consisting only of medication, and she never underwent more aggressive forms of treatment, such as surgery. (*Id.*). Regarding mental impairments, the ALJ cited that Claimant did not have any inpatient hospitalizations and reported symptom improvement with medication and therapy. (*Id.*).

The ALJ next considered whether Claimant consistently complained of and sought treatment for symptoms related to her allegedly disabling impairments. The ALJ concluded that Claimant "mostly sought only routine follow up appointments to get medication refills with few new complaints." (*Id.*). An additional factor that the ALJ considered was whether the objective evidence supported Claimant's allegations. In that regard, the ALJ stated that the diagnostic imaging, testing, and physical examinations showed mild or no abnormalities, and Claimant's symptoms improved with medication and therapy. (*Id.*). The ALJ stated that, despite Claimant's obesity and degenerative disc disease, Claimant typically had normal examinations, other than tenderness, including normal gait, range of motion, extremities, and reflexes. (*Id.*).

Finally, the ALJ stated that, when a claimant alleges significant mental impairments, such as poor memory, concentration, and social functioning, the ALJ would expect treating providers to note those abnormalities on mental status examinations. (*Id.*). However, the ALJ found that Claimant's treating providers usually recorded that Claimant's mental status was normal at appointments, except for her depressed mood

22

and affect, which the ALJ described as "routine findings" that were not "expected to cause significant functional limitation." (*Id*.). The ALJ stated that Claimant generally had normal orientation, speech, thought, concentration, and memory at appointments. (*Id*.).

Reviewing the ALJ's decision and the evidence in this matter, the undersigned finds that much of the ALJ's foregoing analysis is accurate and well-reasoned. However, there are certain critical errors and omissions in the ALJ's subjective symptom analysis which renders it unsupported by substantial evidence. For instance, the ALJ concluded that Claimant mostly sought routine care for medication refills with few new complaints, and her symptoms improved with medication and therapy. This is not entirely correct. Although Claimant sometimes stated that medication made her neck and back pain more tolerable, she consistently reported no improvement or worsening neck and back pain. (Tr. at 511, 514, 516, 518, 520, 523, 525). In addition, Claimant began complaining of pain radiating into her extremities, which was an increase in symptomatology, rather than a decrease. (Tr. at 514, 516, 520, 523). There is no meaningful discussion to indicate that the ALJ considered such conflicting evidence and reconciled it with his conclusion that Claimant's symptoms improved with conservative, routine care of medication refills.

Furthermore, the ALJ determined that, absent some tenderness, Claimant typically had normal examinations, including normal range of motion, extremities and reflexes. While many of Claimant's examination findings were normal, the ALJ's analysis of Claimant's range of motion and reflexes was contrary to the evidence. Claimant consistently had trace deep tendon reflexes, pain on extension in her cervical spine, and slightly reduced flexion and extension in her lumbosacral spine. (Tr. at 512, 514-15, 516-17, 518-19, 520, 523-24, 525-26, 527-28, 530-31). The ALJ failed to consider those abnormal findings and misstated in his subjective symptom analysis that Claimant's

reflexes and range of motion were normal.

Regarding Claimant's mental impairments, the ALJ found that Claimant's symptoms improved with medication and therapy. (Tr. at 25). The ALJ further stated that Claimant's mental status examinations were usually normal, including normal concentration, "except for routine findings, such as depressed mood and affect, which would not be expected to cause significant functional limitation." (*Id*.). However, the ALJ did not provide any meaningful discussion of several considerations that were implicated by the evidence, including the fact that Claimant's psychiatric medications were constantly adjusted in an effort to control her symptoms; she complained of significant sedation from her medications; and she mostly reported no improvement or worsening of symptoms. (Tr. at 412, 413, 414, 416-17, 452, 490, 495, 496, 497, 498). These findings were the rule, rather than the exception, yet the ALJ did not mention them.

In addition, the ALJ provided no explanation or basis for his finding that Claimant's depressed mood and affect, which Claimant displayed in almost all mental status examinations, "would not be expected to cause functional limitation." It is unclear what the ALJ meant by this statement. The ALJ also did not cite or explain the basis for his finding that Claimant's concentration was generally normal at appointments when (1) Claimant's ability to concentrate was scantily mentioned in the records, and (2) the ALJ had found that Claimant showed moderate impairment in that functional area. (Tr. at 20-21). The ALJ cited that Claimant's concentration was fair during a medical appointment in May 2016, but that citation does not provide insight into the ALJ's finding that Claimant's concentration was *typically* normal. (Tr. at 23). The ALJ provided no other basis or explanation for his finding that Claimant generally displayed normal concentration, and such a finding is not apparent from the record.

Finally, although the ALJ referenced Claimant's testimony when considering whether her medically determinable impairments could cause her alleged symptoms, the ALJ provided no meaningful discussion to support his conclusion that the evidence was inconsistent with Claimant's allegations regarding the intensity, persistence, and limiting effects of those symptoms. (Tr. at 22). The ALJ summarized the medical evidence, but he did not compare or contrast it to Claimant's allegations. (Tr. at 23-24). Moreover, Claimant points out that there were other factors the ALJ could have considered; such as, her daily activities, precipitating or aggravating triggers, measures other than medication that she used to relieve her symptoms, and possible reasons that Claimant did not seek treatment consistent with the degree of her complaints. (ECF No. 15 at 8, 10).

SSR 16-3P provides that an ALJ is not obligated to consider or discuss factors for which there is no relevant evidence of record. SSR 16-3p, 2016 WL 1119029, at *7. The ruling also states that the ALJ will only consider and discuss reasons for not pursuing treatment that are pertinent to the individual's case. *Id.* at *9. However, in this matter, the factors and considerations listed by Claimant were relevant. The ALJ acknowledged that Claimant reportedly spent most of the day reclining due to back pain, and used heat and topical numbing creams in addition to medication. (Tr. at 22). The ALJ also noted some of Claimant's testimony concerning neck and shoulder pain, migraines, depression, anxiety, and panic attacks. (*Id.*). Claimant testified that she stayed home, missing doctor appointments and after-school events for her daughter. (Tr. at 55). Claimant stated that, if she had to go out, she structured her activities to avoid people, such as shopping at a smaller, non-crowded store or shopping in the middle of the night. (Tr. at 56). Claimant also made numerous statements to providers concerning postural activities that exacerbated her physical symptoms, and there were various notations that Claimant was

25

sleeping during the day and not leaving her house. (Tr. at 409, 452, 492, 496, 511, 514, 518, 520, 523, 525, 527, 529). Despite noting some of these statements, the ALJ did not articulate how, or even if, he considered and reconciled the above evidence in his evaluation of the intensity, persistence, and limiting effects of Claimant's symptoms. As Claimant indicated, the ALJ focused primarily on the objective evidence in evaluating her statements and symptoms. Furthermore, although the ALJ considered the conservative nature of Claimant's treatment and purported to consider her statements to providers, the ALJ did not discuss in any substantive manner whether Claimant used other measures to relieve her pain and structured her activities to minimize her symptoms, nor did the ALJ meaningfully discuss factors that aggravated her symptoms.

The undersigned cannot conclude that the ALJ's occasional mischaracterization of evidence and his lack of explanation are harmless, because the errors directly impacted the ALJ's subjective symptoms analysis and ultimately the decision regarding whether Claimant is disabled. Therefore, the undersigned **FINDS** that the ALJ's analysis of Claimant's subjective symptoms is not supported by substantial evidence. Accordingly, the undersigned **RECOMMENDS** that the Commissioner's decision be **REVERSED** and that this case be **REMANDED** so that the ALJ may reexamine or elaborate upon all of the relevant factors that concern the intensity, persistence, and severity of Claimant's symptoms.

### B. RFC

In her next challenge, Claimant argues that the ALJ did not explain how he constructed the RFC. Namely, Claimant contends that the ALJ cited evidence that was contrary to the RFC assessment and did not explain the functional limitations which he assessed. Further, Claimant asserts that the ALJ did not explain how her March 2019

lumbar CT scan was consistent with the RFC and why it was not a significant advancement from prior findings.

SSR 96-8p provides guidance on how to properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. RFC is a measurement of the **most** that a claimant can do despite his or her limitations resulting from both severe and non-severe impairments, and the finding is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.* According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3.

Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." *Id.* Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4. In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material

inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at \*7.

While an ALJ is not required to explicitly discuss "irrelevant or uncontested" functions, "[r]emand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)) (markings omitted).

In this case, the ALJ found that Claimant was capable of work at the sedentary exertional level based on her MRI showing degenerative disc disease; obese BMI; and "mild abnormalities" on physical examination, such as tenderness to palpation and pain with range of motion. (Tr. at 25-26). However, the ALJ did not explain the basis for his incongruent RFC finding that Claimant could frequently lift and carry ten pounds, which is an exertional requirement of light work. 20 C.F.R. §§ 404.1567, 416.967. The ALJ stated that he gave little weight to the prior administrative medical findings of the state agency physicians, who assessed that Claimant could perform work at the light exertional level, specifically because of Claimant's degenerative disc disease on MRI, obese BMI, tenderness to palpation, and pain with range of motion. (Tr. at 25-26). Therefore, the ALJ's explanation and the evidence that he cited is inconsistent with his RFC finding.

The undersigned appreciates that it is likely a typographical error in the decision, and the ALJ intended to conclude that Claimant has the RFC to frequently lift less than ten pounds. In that case, the error is harmless because the VE testified that the jobs that the ALJ relied upon on at step five can be performed by a person who can frequently lift less than ten pounds.

However, the ALJ further assessed postural and manipulative limitations related to Claimant's ability to reach, climb, balance, kneel, crouch, and crawl for which he provided no explanation, and that error is not harmless. Reviewing the record and decision, the postural and manipulative limitations which the ALJ assessed correspond to the findings of state agency physician, Dr. Lo. (Tr. at 21-22, 104-06). Yet, the ALJ stated that he gave little weight to Dr. Lo's findings because the record supported a sedentary RFC based upon Claimant's lumbar and cervical MRIs, tenderness to palpation, and obese BMI. (Tr. at 27). That explanation only concerned why the ALJ did not find Dr. Lo's opinion persuasive regarding exertional limitations. It does not provide any insight into why the ALJ assessed the specific postural and manipulative limitations found in the RFC.

In addition, while the ALJ listed evidence in the decision, he generally emphasized normal findings, and he did not connect the evidence to his RFC conclusion. "[A] proper RFC analysis has three components: (1) evidence, (2) logical explanation, and (3) conclusion," and "[t]he second component, the ALJ's logical explanation, is just as important as the other two." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). The Fourth Circuit has explained that "meaningful review is frustrated when an ALJ goes straight from listing evidence to stating a conclusion." *Id.* Given that the ALJ assessed significant exertional, postural, manipulative, and mental limitations in this matter, those functional areas warranted a discussion of his thought process. The ALJ is required to articulate a function-by-function analysis to explain the RFC finding.

Finally, the ALJ did not explain how Claimant's March 2019 lumbar CT scan—which reflected the presence of a herniated disc at L4-5 with moderate to severe central canal stenosis—factored into the RFC finding. The ALJ merely listed this piece of evidence without any substantiative analysis. (Tr. at 24). Despite the CT scan arguably showing a

significant change since Claimant's prior study in July 2018, there is no indication what, if any, weight the ALJ gave to that piece of evidence. (Tr. at 537). The ALJ stated that he considered Claimant's MRIs, which showed "mild or no abnormalities," in assessing Claimant's RFC. (Tr. at 25). However, the ALJ did not discuss the most recent CT scan confirming moderate to severe stenosis. As previously stated, an ALJ is not obligated to explicitly mention every piece of evidence, but the ALJ should expressly address evidence that suggests a substantial positive change, or deterioration, of a claimant's severe impairment. In this case, the 2019 CT scan result included a significant enough change to merit analysis in the determination of the RFC finding.

Therefore, for the above reasons, the undersigned additionally **FINDS** that the ALJ's analysis of Claimant's RFC is not supported by substantial evidence. On remand, the ALJ should reexamine or elaborate upon Claimant's functional abilities and the RFC finding.

## VIII.  **Recommendations for Disposition**

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **GRANT** Plaintiff's request for judgment on the pleadings, (ECF No. 14), to the extent that it requests remand of the Commissioner's decision; **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 16); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this PF&R; and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is

hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Judge and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Faber, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** June 7, 2021

Cheryl A. Eifert
United States Magistrate Judge